## NATIONAL FERTILIZER ASS'N, Inc., et al. v. BRADLEY et al.*

### Equity No. 513.

District Court, W. D. South Carolina.

Dec. 8, 1936.

*Decree affirmed 57 S.Ct. 748, 81 L.Ed. ——.

274

clarify and explain the decision of the court. Manifestly, Equity Rule 70½, 28 U.S.C.A. following section 723, reading as set out below[2] requires the trial court to present its findings of fact on vital matters in a much more definite way than was formerly the practice. An appellate court can much better ascertain the views of the trial court about questions of fact when they are separately stated than disentangle them from a general opinion in which findings of fact are intimately intermingled with legal propositions. In this particular case, we have taken the view that a full statement of the findings of fact is not only necessary, but is the most important element in the decision of the case. After all, in constitutional cases where the attack on a state statute is made on the ground of arbitrariness, impossibility of enforcement and unreasonable hardship, the decision of the final issue depends essentially upon the factual showing. The Supreme Court of the United States has only recently in the Stockyards Case (St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033, and in the case of Nashville, C. & St. L. Railway v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949, pointed out that in cases of this character the decision of the questions of fact is the important matter both in the trial court and on final appeal to the Supreme Court of the United States.

Elliott, McLain, Wardlaw & Elliott, of Columbia, S. C., for plaintiffs.

John M. Daniel, Atty. Gen. for the State of South Carolina, J. Ivey Humphrey, Asst. Atty. Gen. of South Carolina, and Harold Major, of Anderson, S. C., for defendants.

Before PARKER, Circuit Judge, and WATKINS and GLENN, District Judges.

GLENN, District Judge (after stating the facts as above).

The function of an opinion in an equity case where full findings of fact and conclusions of law, separately stated, are also filed, is to tie the two together so as to

### Subject-matter of the Suit.

Agriculture is the chief industry of the state of South Carolina. The census of 1930 shows that most of the adults in the state were engaged in farming and derived their chief support from agriculture. The witness, Hamilton, thoroughly familiar with agriculture in South Carolina, testifies as follows: "Now, my work, that has been continuously with the farmers, and one of the greatest problems that we have and the subject which I have had to give more information on to the farmers in South Carolina is fertilizer. We have in South Carolina 165,000 farmers—I don't mean rural population, but 165,000 farms or farmers which include share-croppers, ten-

[2] "In deciding suits in equity, including those required to be heard before three judges, the court of first instance shall find the facts specially and state separately its conclusions of law thereon; and, in granting or refusing interlocutory injunctions, the court of first instance shall similarly set forth its findings of fact and conclusions of law which constitute the grounds of its action.

"Such findings and conclusions shall be entered of record and, if an appeal is taken from the decree, shall be included by the clerk in the record which is certified to the appellate court under rules 75 and 76. (Amended Nov. 25, 1935.)"

ants, wage hands and the land owners. Almost without exception every one of those farmers, his living and his welfare is affected by fertilizer because every one of them that grows any cash crop uses fertilizer with the exception, I will admit, in the time of depression when they don't have money to buy fertilizer. If it went up, in case they choose to do without it, they do without it because they cannot pay for it." The use of commercial fertilizers in agriculture has always been a practice in this state. As testified in this case, most of the farmers in South Carolina use commercial fertilizer, and the annual expenditure therefor runs into the millions of dollars. Of course, large use is made of the manure obtained from domestic animals on the farms themselves, but from the very beginning it has been recognized that this source is not only inadequate so far as quantity is concerned, but has not the variety of content necessary for producing the staple crops of the state. Wise or unwise, South Carolina has always produced marketable crops such as cotton, truck, and tobacco very greatly out of proportion to the livestock raised in the state. To meet this demand for commercial fertilizer corporations have developed this enormous business. The commercial fertilizers are manufactured and sold in this state, and such manufacture and sale have inevitably been the subject matter of legislation by the state Legislature.

In the early nineties an agricultural college was established in the state. This institution, Clemson Agricultural College, has grown rapidly and has through many agencies spread the information with reference to the use of fertilizers to the farmers themselves. By reason of federal and state legislation and enabling appropriations, county demonstration agents have been abroad in the land, and with more or less efficiency and success have brought the benefits of scientific investigation and experiment to the farmers and enlightened them on the proper use of commercial fertilizers. Clemson Agricultural College has been largely supported by a sales tax on the fertilizers used in the state. The theory is that the college and its ancillary services are primarily for the farmers and it is nothing but just that the proceeds of the sales should support this institution and its extension work. Therefore, we find that the trustees of this institution are logically charged with the enforcement of the fertilizer law. These trustees are, therefore, properly named as the defendants in this suit.

Statutes of the state have for years made it necessary for the fertilizer companies to show by way of tag the contents of the particular mixture contained in the sack. As pointed out in the findings of fact in great detail, the farming population has for a long time known the particular value of three major plant food elements. These three plant foods are phosphoric acid, nitrogen, and potassium. The terminology used in statute and regulation has not always been uniform or accurate. Phosphoric acid is valuable because it contains a large percentage of the ultimate chemical element phosphorus. Nitrogen is the ultimate chemical element of value contained in the substances variously referred to as nitrogen and ammonia. Potassium is the ultimate chemical element contained in the substance more frequently referred to as potash. So in this discussion we refer to these major plant foods as phosphoric acid, nitrates, and potash. For many years the law required the analysis of the final mixture as put into the sack to be shown on the tag attached thereto and to reveal the percentage, in the final mixture, of these three major plant foods.

As science and experience have enlightened the farmers about the use of fertilizer, regulation by the Legislature has required the publication on the tag of increasing information. Several years ago a statute was passed requiring the fertilizer companies to declare from what sources these major plant foods were obtained. This requirement was generally found to be so reasonable and to meet such a reasonable need for information on the part of the farmers that no serious question has ever been made of its propriety in fact or in law. Additional legislation has required the information to be given with greater particularity than this so far as the nitrates are concerned. The function of the nitrates generally is to speed the growth of the plant during the growing season. Nitrates, if rapidly soluble, accelerate the growth of the plant itself in a very positive and evident way. Nitrates, when less soluble, are no less valuable for certain types of crops on certain types of soil, but the effects are distributed over a longer period and the increased rate of growth not so noticeable. It was, therefore, nothing but

reasonable that the manufacturer and seller of commercial fertilizer should be required to show the nature of the nitrates supplied in his mixture offered for sale with respect to "solubility" or "insolubility." We find under the testimony that a definite classification of nitrates into "soluble" and "insoluble" has grown up and come to have very definite meaning with respect to commercial fertilizers.

But as time has gone on and the farmers have become more and more enlightened, and the Legislature more and more mindful of the needs and desires of the farmers, it was felt that even this information was not sufficient and that not only should the purchasing farmers have information as to the major plant foods contained in the final mixture and the sources from which they were derived, but that they were entitled to a quantitative statement of the poundage of such sources used by the manufacturer in supplying the desired percentage of each major plant food contained in the final mixture. This is better understood when we explain the meaning of the word "source." In the fertilizer business, manufacture, sale, and use, the word "source" means that substance which is commonly used as a carrier for a particular plant food element. For example, nitrate of soda is a source or carrier of the desired plant food nitrogen. Nitrate of soda also contains a small percentage of potash, and, therefore, nitrate of soda is properly referred to as the "source" or "carrier" for both nitrogen and potash.

Pursuant to this feeling, therefore, there was passed at the 1936 session of the Legislature of South Carolina an amendment to the fertilizer laws putting into effect what is popularly known as the "Open Formula" (39 St. at Large, p. 1400). This amendment was added at the end of one of the important sections of the fertilizer law as it then existed, and is as follows: "'(b) That the amount and *Analysis* of each material, or source, of each plant food element used in manufacture, of a fertilizer mixture containing two or more plant food elements be stated on a tag attached to each sack or container, such amounts of materials to be stated in pounds per hundred pounds of mixture contained in the sack or other container. This statement of pounds of materials used in the manufacture, of a fertilizer mixture shall be in addition to the statement of chemical analysis as required by Section No. 6366 of the Code of Laws of South Carolina, 1932.'" (Italics ours.)

The fertilizer companies have brought this suit to enjoin the enforcement of this Open Formula statute, and thus the questions are presented to this court for decision. The attacks on the statute are primarily on constitutional grounds and we may sum them up in four major contentions. The stated contentions of the plaintiffs are well phrased, but for purposes of clarity and discussion as we view the case, we see fit to phrase them as follows:

I. That the statute, couched in indefinite and inaccurate language, is incapable of reasonable enforcement. That the only honest enforcement on the part of the enforcing agencies will amount to unreasonable and arbitrary taking of plaintiffs' property and so harm their businesses as to confiscate and destroy them. Stated in other words, that honest compliance on the part of the companies with the terms of the statute will be so expensive as to destroy the plaintiffs' businesses in violation of their constitutional rights.

II. The second constitutional question, as we view it, is closely akin to the first one and dependent upon the decision of the first question for a correct understanding thereof. It is briefly that the statute, even if susceptible of a reasonable interpretation by enforcing agencies, and even if susceptible of compliance by the plaintiff companies, nevertheless amounts to an unlawful, unreasonable, and unconstitutional exercise of the police power of the state of South Carolina. That the statute has no foundation in the necessities of the purchasing farmers and will not tend in any reasonable way to satisfy an existing need, but only serve to satisfy curiosity on the part of the farmers.

We say again that the decision on this constitutional question depends largely upon our decision on the first constitutional question presented; namely, upon the interpretation of the statute.

III. That the statute when enforced will deprive the companies of the value of certain property rights which they have by reason of the value of secret formulæ and trade-marks which they have built up by years of experience and at an enormous expense. That this destruction of property values is not necessary to meet any existing needs of the farmers of the state, is without compensation, is arbitrary and un-

reasonable and amounts to the taking of property without due process of law and denies to the plaintiffs the equal protection of the law; all in violation of the Fourteenth Amendment to the Constitution of the United States and similar provisions of the Constitution of South Carolina.

IV. A final contention is made by the plaintiffs that the statute is unconstitutional because it makes no provision for the disposition of existing stocks of fertilizer on hand in South Carolina and with respect to which compliance with the new statute is practically an impossibility. That this destruction of the value of these existing stocks is the taking of property without due process of law, is unreasonable and arbitrary, and being a taking without compensation, is in violation of the Fourteenth Amendment to the Federal Constitution.

In our opinion, the first two contentions are the vital ones. Is the statute voided for indefiniteness, and is it impossible of enforcement, and resulting compliance, without unreasonable expense?

We must, therefore, address ourselves to the construction of this amendment, putting into effect the Open Formula statute. In doing so, we invoke immediately a well-accepted principle of construction frequently applied in cases of this character. It is well settled that in construing a statute which has not yet been applied by a regulatory body charged with its enforcement, a court must assume that the statute will be given a reasonable and constitutional interpretation if possible. The Board of Trustees of Clemson College have not as yet issued any rules and regulations as to the enforcement of this statute. At this stage we are without the benefit of knowing how they will construe the individual phrases used in the statute or how they will apply the statute as a whole. We must, therefore, assume that both in determining the meaning of certain key phrases in the statute and in determining the effect of the statute as a whole this administrative body will, as they should, give both individual phrase and entire statute a reasonable interpretation. We do have, however, as indicative of the probable compliance with this principle of statutory construction by the enforcing agencies the benefit of their spirit and attitude in enforcing previous statutes. It is important to note that several of the key phrases in this statute have occurred from time to time in previous statutes regulating the fertilizer business and have been given a reasonable and sane construction by the enforcing agencies. We take occasion at this point in our opinion to call particular attention to this matter because we think that it is vital to the correct understanding of our decision.

The proper construction by us, and by the administrative agencies of the word "analysis" as used in the statute is important in determining whether or not the statute as actually applied will be reasonable or unreasonable. We have been at great pains in our findings of fact to deal with this word "analysis" and have pointed out with the greatest clarity of which we are capable, that it must be given a reasonable interpretation and not a highly technical interpretation. As we have pointed out, we do not view it as requiring a complete chemical analysis of every substance, however remote its origin, entering into the final product. It is significant to here point out that even where the phrase "chemical analysis" has been used in previous statutes, such chemical analysis has been construed to be sufficient if it showed the three major plant foods with which the farmers were familiar and about which they desired knowledge in making their choice of fertilizers. If this administrative agency has given the phrase "chemical analysis" such a reasonable interpretation, we feel that we are justified in assuming that such a reasonable interpretation will be made of the broader term "analysis" as it appears in the instant statute.

This rule of statutory construction which the court has invoked is important also in determining the anticipated regulations with respect to the quantitative showing required by the statute. It may be conceded that the statute would put an unreasonable, arbitrary, and unjust burden upon the companies if it should be construed to mean that the companies would be required by the enforcing agencies to keep separate books on the history of the process of mixings for each 100 pounds. This would manifestly increase the amount of bookkeeping necessary, would increase the amount of labor required, would increase the size of the mixing and storage bins necessary, and would increase all of these factors to such an extent that the resulting expense would practically mean the destruction of the complainants' business. Indeed, it would appear reasonable that

those increased costs on the final product would practically mean that the farmers could no longer buy commercial fertilizers except those of the very cheapest grades. But, instead of presuming that the statute will be given such a high-handed, unreasonable, and vicious interpretation by the enforcing agencies, both experience and well-settled principles of law justify us in assuming that the interpretation and enforcement will be reasonable and just. The testimony shows abundantly that, while smaller mixtures are sometimes made, the usual volume involved in what we would call a mixture from the manufacturers' standpoint is a pile of practically uniform composition ranging in size from 1,000 to 5,000 tons. The physical way in which each batch of fertilizer as it comes from the machine mixer is poured upon the curing and storage pile is really the key to the understanding of this phase of the case. The testimony is that each batch as it falls from the mechanical mixer is taken up overhead and poured on the pile in such a way that a small portion of each batch finds its way to the three if not the four corners of the pile. Indeed, as the final mixture of fertilizer falls on the storage pile, it falls in conical rather than a cubical form.

From this we conclude that a reasonable interpretation of the statute by the enforcement agencies, such as we have a duty to assume they will make, would be satisfied if the revelation on the tag showed the general average with respect to all items of information contained on the tag coming from an honest desire to make the pile of 5,000 tons of uniform composition. If this is what the statute requires with reference to the history of each mixture and with reference to the piling and storing thereof, there is practically no additional burden or expense put upon the manufacturing company which is not already incident to the business.

■ But even if there is demand for unusual mixtures, and even if the manufacturers do from time to time have to keep fuller records and more intricate historical showings of the processes with respect to the mixtures finally offered for sale, all of this is no new element in the business. Neither will the enlargement of warehouses within reasonable degree for storing of many smaller piles bring a new or unreasonably expensive element into the business. Fertilizer factories, by reason of the odors emitted, are generally located on spur tracks, well away from residential and business centers. The storage sheds are simple wooden sheds over concrete floors, and enlargement of these rather rude structures over inexpensive real estate will not actually increase the cost per ton to any great extent. We cannot help but think that the plaintiffs, both in testimony and argument, have overemphasized the extent of this increased expense.

The testimony is abundant that upon specific demand the companies have already been mixing special mixtures for large farmers and storing them separately. Accounting methods have already determined the increased charge which takes care of this extra expense of records and storage to the satisfaction of the selling companies. The testimony is that a charge of from 50 cents to $2.50 has heretofore taken care of this extra charge in sporadic cases. Certainly if the demand for such better records and enlarged storage is going to be widespread, the charge, instead of increasing, should decrease. Having the opinions indicated in this brief discussion of the interpretation and application of the statute as it will probably be made by the enforcing agencies, we can see nothing to the plaintiffs' contention in their first attack on the constitutionality of the statute.

■ We do not leave this phase of the case, however, without saying that final word on the interpretation of this amendment will not be with the administrative agencies but with the Supreme Court of the state of South Carolina, and of course that court will put reasonable construction upon both particular phrases and purport of the entire statute. This proposition that a court in passing upon the constitutionality of a statute must assume that enforcing agencies will give reasonable and sensible interpretation rather than unreasonable and arbitrary interpretation is so well settled that the authorities cited here are cited in the footnote rather than in the body of this opinion. The rule can be stated in stronger terms, that in a situation like this, the court must assume that a statute, if capable of an interpretation effecting a constitutional result, will be given that interpretation by both state administrative agencies and state Supreme Court, charged with the duty of finally interpreting a State Statute.

We are not willing at this time to seriously entertain the prediction that either agency of state government, executive or judicial, will make the strained construction of the statute of which the plaintiffs contend that the statute is capable. We are prevented from doing so both by common sense and well-settled principles of law.

■ 2. Closely akin to the proposition of law we have just been discussing are those involved in dealing with the second question of constitutional law. Is the statute here such an unreasonable, arbitrary, and high-handed exercise of the police power as to be unconstitutional under the Federal Constitution?

First, it will be our duty to decide whether or not the statute as reasonably interpreted tends to accomplish the evident purpose of the Legislature.

Secondly, if it does, does it do so in a reasonable way?

In our findings of fact we have discussed this phase very fully. We have been at great pains to point out the increasing knowledge on the part of the farmers of South Carolina of the correct use of fertilizers. If we felt that the open formula statute simply put an additional burden upon the plaintiffs without a corresponding benefit to the intended beneficiaries of the statute, it would seem that we would be forced to the conclusion that the statute was unreasonable and arbitrary. However, it is shown that, in the progress which agriculture is making in this state, the farmers know very well the practical results obtained from the different types of fertilizers. There was a time when a bald statement that the fertilizer was 8–3–3 was sufficient. The farmer in a rough sort of way knew that phosphoric acid, nitrates, and potash were beneficial to his land, but now he knows a great deal more. He knows a great deal more not only about the fertilizers themselves, but he knows a great deal more about his own land and its particular needs. His choice of a fertilizer to meet his particular needs, both as to plants raised and soil cultivated, is now made with a great deal of intelligence; he, therefore, has both the need and the desire to know with increased certainty both the analysis and the history of the fertilizer he is buying. To meet this need in an effective way, the Legislature passed the statute. The statute, when reasonably interpreted, tends in a definite and reasonable way to meet this existing need. This test as to the validity of the statute under the police power has, therefore, been met, and the statute must be sustained against this attack.

The attack on the statute as being beyond the police power on the theory that it is void and incapable of honest enforcement and obedience has already been discussed in the first phase of this opinion. The state has under its police power the right to require manufacturers to operate under more expensive conditions. It has a right to require that more elaborate and accurate records be kept as to a particular business, provided, that such increased expenses do not so increase the costs of manufacture and record as to increase the costs of the finished product to such an extent that the business is practically destroyed. On this score, in our findings of fact we have found that the increased costs of manufacture and record are met by a small charge which, as a matter of custom, has been passed on to the consumer, neither is the amount of this charge so great as to suggest in anywise that the quantity of fertilizers purchased will be substantially decreased. Indeed, according to the theory of the plaintiffs' testimony, the better the fertilizer meets the needs of the farmers the more they will buy and the better their crops will be on a given acreage, and the better situation the farmers will be in financially to pay for the fertilizer which they purchase. The testimony of various experts and sales managers, plaintiffs' own witnesses, is that the better the fertilizer and the more intelligent its choice, the better is the result for the farmers. They say that this is true both as to individual farmers and to agriculture generally.

■ 3. What about property rights in the shape of secret formulæ and trade-names, and their destruction by the statute? To begin with, it is doubtful whether these secret formulæ and trade-names belong personally to the plaintiffs. These secret formulæ used by the plaintiffs have been so largely contributed to by the experience of the farmers themselves, by the scientific revelations of federal and state agronomists and lessons learned by Clemson College in its various experiment stations, that it is rather difficult to say that they are the personal property of the plaintiffs. They are rather the adoption by the plaintiffs of

common revelations made by many agencies in the search for better and cheaper fertilizers. It is true that the companies themselves have done their part and by experiment and research made definite contribution along this line.

But, even if we were convinced that the secret formulæ here shown by much testimony to be the basis of property rights cognizable in the courts, yet these rights must yield when they conflict with a valid exercise of the police power of a state. It may seem hard that these secret formulæ cannot be universally recognized and protected by the courts, but it is well established that secret formulæ as well as other rights must frequently yield to the valid exercise of the police power by a sovereign state. The control of proprietary medicines by state and nation is an exact analogy. If secret formulæ of medicines for human consumption can be forced to revelation in the exercise of police power it seems to follow, as night the day, that secret formulæ with respect to the supply of plant food must likewise yield to a reasonable and valid exercise of police power. The care for the health and well-being of people who take medicines is a proper subject for the exercise of police power on the part of a vigilant legislature in a progressive state. We can see no reason why the Legislature of a state may not compel a reasonable revelation of the source and nature of the plant foods contained in a fertilizer sold to the farmers of the state. It must be remembered that agriculture constitutes the major industry of South Carolina, it is the industry from which hundreds of thousands draw their complete livelihood. Surely in the exercise of police power over the sale of commercial fertilizer, the Legislature of an agricultural state has the power to subordinate rights growing out of secret formulæ to a reasonable and valid exercise of the police power vested in the state.

We have stated the fourth contention of the plaintiffs as follows: "IV. A final contention is made by the plaintiffs that the Statute is unconstitutional because it makes no provision for the disposition of existing stocks of fertilizer on hand in South Carolina and with respect to which compliance with the new Statute is practically an impossibility. That this destruction of the value of these existing stocks is the taking of property without due process of law, is unreasonable and arbitrary,

and being a taking without compensation is in violation of the Fourteenth Amendment to the Federal Constitution." This attack seeks to condemn the act as unconstitutional because of its application to existing stocks of fertilizer on hand and unsold, even if it is upheld as to stocks of fertilizer resulting from future manufacture. We think that this contention of the plaintiffs amounts to nothing, in view of the interpretation of the act which we have set forth in our answer to the first constitutional objection. Every reason which suggests that a sensible interpretation will be given by the administrative agencies as to the future manufacture applies with even greater force to their attitude towards existing stocks. There is nothing in the statute or in this suit on the statute which would deprive the enforcing agencies of their authority to act sensibly and reasonably with respect to the existing stocks. The companies admittedly have available the records as to the materials which have gone into the fertilizers which they have on hand. All that we have said about the possibility of showing the contents of each sack on the principle of averages applies to the stocks on hand as well as to the manufacture of fertilizer in the future. It may be that the search for data in order honestly to comply with the statute, as it applies to the stocks on hand, will involve retrospective work rather than prospective work. There is, however, no showing before us that such retrospective work on the records of the companies will not be reasonably accurate and will not enable the companies to comply in a reasonable way with the terms of the statute. It is true that the companies were not advised when these stocks were manufactured that they would be required to publish such data as is now required by the Open Formula statute. But they, the plaintiffs, upon whom the burden rests to show that it is impossible to obtain such data from the records which they have, or that the obtaining of such data would be an unreasonable and arbitrary burden, have not shown that to this court. In adjusting the terms of the statute to the data capable of revelation by reasonable search, the enforcing agencies will, we are sure, act with common sense, and that no capricious or vicious action on their part will characterize their attitude towards the disposition of these existing stocks. Administrative agencies vested with discretion do not act stupidly, but should they adopt such a

course, recourse can still be had to the court for injunctive relief. As a matter of fact, a long period of immunity has been accorded the plaintiff companies during the pendency of this suit.

■ We feel, too, that under the testimony we could dispose of this contention because of the small amount of fertilizers on hand when viewed in comparison with the enormous business done by the plaintiff companies. The amount of fertilizers on hand is so small as hardly to merit special consideration, and certainly the whole act will not be declared invalid on account of the remnants in the hands of a few companies. Injunction would not be granted to protect these remnants from reasonable enforcement even if the law were invalid as to them, because, in our opinion, there would be a complete and adequate remedy at law. If the state sought to prosecute the companies for disposing of such small stocks, the defense of unconstitutional application of the statute to the sale of these small stocks could be set up as a defense to the criminal prosecution. If the form of the action turns out to be a suit for the penalties, under the applicable statutes, the companies could still set up the unconstitutional application of the statute in this respect as a defense to such suit for the penalty. In either type of action a full, complete, and adequate remedy at law will be available to the plaintiff company which still has on hand any considerable amount of fertilizers. Then, if the essential elements of federal jurisdiction are present, such action can be tried in the federal courts and the complete and adequate remedy at law will therefore be one available in the federal courts. Matthews v. Rodgers, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447.

■ All through this opinion we have avoided any discussion at all on the wisdom of this legislation. We have been of course mindful that the wisdom and policy of such legislation is a question for the Legislature. The fact that we may think that the statute does require the publication of some information which may not be necessary at all times to every purchasing farmer does not justify us in striking down the statute as being unreasonable and arbitrary. As we have said before, we must presume that the enforcing agencies will give the statute a reasonable and sensible construction both as to particular term and general purpose. The testimony shows clearly that they have so acted in similar matters over a long period of years. But quite apart from this, we must presume that the enforcing agencies will act in a constitutional way and give the statute an interpretation which will effect a constitutional result, rather than go out of the way and presume that the enforcing agencies will put an unconstitutional interpretation upon the statute simply because it is stoutly contended that such an unconstitutional interpretation is possible. We have endeavored to point out that the interpretation of the statute which the plaintiffs insist may be made would be highly technical and arbitrary, and we are prevented from considering this interpretation by previous conduct of the enforcing agency, by common sense, and above all by well-settled principles of statutory construction.

In this opinion we have avoided the citation of many cases which would sustain the rather primary principles of constitutional law herein discussed. The cases which we have considered and which have controlled our decision on various phases of the case, are cited in notes at the end of this opinion.[3] For the reasons set forth

[3] Note II: The proposition is stated as follows: "The statute must be construed if fairly possible so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts on that score. In other words, in testing the constitutionality of a statute, the language must receive such construction as will render it constitutional, if it is reasonably susceptible of such interpretation."

Otherwise stated: "When the constitutionality of a statute is questioned, it is the duty of the Courts, and also a rule of construction to adopt such construction as will make the statute constitutional if its language will permit." Presser v. Illinois, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615;

Phelps v. United States, 274 U.S. 341, 47 S.Ct. 611, 71 L.Ed. 1083; Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L. Ed. 270; United States v. Coombs, 12 Pet. 72, 9 L.Ed. 1004; The Abby Dodge, 223 U.S. 166, 32 S.Ct. 310, 56 L.Ed. 390; United States v. Standard Brewery, 251 U.S. 210, 40 S.Ct. 139, 64 L.Ed. 229; South Utah Mines & Smelters v. Beaver County, 262 U.S. 325, 43 S.Ct. 577, 67 L. Ed. 1004; Lindsley v. Natural Carbonic Gas Co. (C.C.) 162 F. 954; Id., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas. 1912C, 160; St. Louis Southwestern R. Co. v. Arkansas, 235 U.S. 350, 35 S.Ct. 99, 59 L.Ed. 265.

Note III: The rule of construction also

in this opinion, which must, as we have said be read in connection with the rather full findings of fact herewith filed, we think that this bill should be dismissed and the injunctions, both interlocutory and permanent, should be denied.

### Final Decree.

For the reasons set forth in the findings of fact, the conclusions of law and the separate opinion filed herewith, the plaintiffs are not entitled to the relief sought in their bill.

It is, therefore, ordered, adjudged and decreed:

I. That the bill be, and the same is hereby dismissed and the relief sought therein be, and the same is hereby denied.

II. That the interlocutory injunction applied for and sought by the plaintiffs herein be, and the same is hereby denied by the court properly constituted to hear such application.

III. That the permanent injunction against the enforcement by the defendants of the 1936 amendment to the fertilizer laws of South Carolina be, and the same is hereby denied. This amendment reads as follows: "(b) That the amount and analysis of each material, or source, of each plant food element used in manufacture, of a fertilizer mixture containing two or more plant food elements be stated on a tag attached to each sack or container, such amounts of materials to be stated in pounds per hundred pounds of mixture contained in the sack or other container. This statement of pounds of materials used in the manufacture, of a fertilizer mixture shall be in addition to the statement of chemical analysis as required by Section No. 6366 of the Code of Laws of South Carolina, 1932," being an act amending section 6367, Code of Laws of South Carolina 1932 (39 St. at Large, p. 1400).

has an extension, the court is under the duty not only to presume that the statute is constitutional, but also to presume that enforcing agencies will give the statute a reasonable and constitutional interpretation. See Plymouth Coal Co. v. Pennsylvania, 232 U.S. 531, 34 S.Ct. 359, 58 L. Ed. 713; Fox v. Washington, 236 U.S. 273, 35 S.Ct. 383, 59 L.Ed. 573.

Note IV: Questions of policy are for the Legislature and not for the court. The rule is well stated as follows: "The police power springs from the obligation of the State to protect its citizens and provide for the safety and good order of,

society, and permits reasonable regulation of rights or power in particulars essential to the preservation of the community from injury." Erie Railroad Co. v. Williams, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155, 51 L.R.A.(N.S.) 1097; L'Hote v. New Orleans, 177 U.S. 587, 20 S.Ct. 788, 44 L.Ed. 899; Graves v. Minnesota, 272 U. S. 425, 47 S.Ct. 122, 71 L.Ed. 331; New York ex rel. Silz v. Hesterberg, 211 U.S. 31, 29 S.Ct. 10, 53 L.Ed. 75; Holden v. Hardy, 169 U.S. 366, 18 S.Ct. 383, 42 L. Ed. 780; Purity Extract & Tonic Co. v. Lynch, 226 U.S. 192, 33 S.Ct. 44, 57 L. Ed. 184.